

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

**JACKSON DIVISION**

| | |
|---|---|
| SCOTT M. CRAWFORD, DEWONE BANKS, JASON<br>BUNCHE, GWENDOLYN BYRD, LEE COLE, JAN<br>HAWTHORNE, IRENE MYERS, BONNIE<br>THOMPSON, MELVINA TOBIAS, EDDIE TURNER,<br>JERRI WALTON, MISSISSIPPI COALITION FOR<br>CITIZENS WITH DISABILITIES, MISSISSIPPI<br>COUNCIL FOR THE BLIND JACKSON CHAPTER,<br>ON BEHALF OF THEMSELVES AND ALL OTHERS<br>SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF JACKSON AND CITY OF JACKSON<br>PUBLIC TRANSPORTATION SYSTEM ("JATRAN"),<br><br>Defendant | Case No.: 3:08cv586 TSL-JCS<br><br>**COMPLAINT** |

Plaintiffs, by and through their undersigned counsel, on behalf of themselves and all others

similarly situated, sue the City of Jackson, ("Jackson" or "the city" or "City") and the City of Jackson

Public Transportation System ("JATRAN"), (collectively "defendants" or "Defendants") and allege

as follows:

## INTRODUCTION

1.      This is a class action for declaratory and injunctive relief to remedy Defendants'

continuing violations of the rights of the individual Plaintiffs and the Plaintiff class to basic

and essential transportation services under Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131 et. seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, et. seq. ("Rehabilitation Act"), 42 U.S.C. § 1983 et. seq. ("Civil Rights Act") and the enacting regulations promulgated under these statutes.

2.      Jackson, Mississippi is the capitol city of Mississippi with a population of 180,000 and a population of approximately 13,000 people with disabilities.

3.      The defendants are responsible for operating a fixed route bus system with a fleet of approximately 24 buses.  The fixed route buses operate six days per week, Monday through Saturday, from 4 AM through 7 PM.  As required by Title II of the ADA, Defendants also provide complementary "paratransit services" ("handilift" or "paratransit") to individuals with disabilities.

4.      On information and belief, JATRAN's paratransit service, handilift, transports approximately 150 riders per day between the hours of 5 AM and 7 PM.  There are 12 handilift buses, but only 8 are used each day.  Despite being approximately five years old, the handilift buses break down regularly because of the extensive mileage put on each of these buses.

5.      Many individuals with disabilities, including the individual Plaintiffs, must depend on JATRAN's paratransit service and fixed route buses to conduct crucial aspects of their daily lives.  In many cases, JATRAN riders, including Jan Hawthorne, Gwendolyn Byrd, Lee Cole, Jason Bunche and Jerri Walton rely upon handilift to travel to and from work.  Other Plaintiffs, including Plaintiffs Scott Crawford, Dewone Banks, Jason Bunche, Irene Myers, and Melvina Tobias, must depend on handilift as a fallback because the fixed route buses and bus stops are not accessible to people with disabilities.  Specifically, the lifts on the fixed route buses often do not work and many of the fixed route bus stops are not accessible to the plaintiffs and other individuals with disabilities.  As a result, many of the individual

plaintiffs have used handilift to pick them up to transport them to public events, doctor's appointments, the post office, and the grocery store.

6.      The handilift paratransit service is not foolproof.  The buses are old and in disrepair.  The dispatchers are untrained and, at times, insensitive to the needs of people with disabilities. Rides are circuitous, causing riders to schedule large amounts of time to take short trips.  The handilift buses and lifts break down regularly because of their regular use.

7.      Because of the unreliability of JATRAN for persons with disabilities, the Plaintiffs risk being unable to work in some cases.  In all cases, they risk isolation and being deprived of the personal rewards of being interactive members of society.  In many cases, the plaintiffs and other people with disabilities are unable to conduct life-saving functions such as buying groceries or getting to a doctor's appointment without these services.  There are no taxi services for mobility impaired people with disabilities in Jackson.  All handilift users depend on handilift for important personal appointments much as individuals without disabilities rely on their personal automobiles, JATRAN, and even walking to conduct their personal affairs.  Because of the unreliability of the fixed route bus system, handilift users also depend on handilift to exercise certain of their fundamental rights including the right to access courts, serve on a jury, vote, exercise religion, engage in free speech and assembly, petition the government and to obtain services that are essential to engaging in society in addition to the above-referenced survival needs.  These services range from education and employment to food and medical care.

8.      Despite the crucial role that JATRAN's fixed route bus, and by necessity, handilift service must play in the lives of its users, it fails to provide even minimally adequate service and is materially inferior to the JATRAN public transportation available to people without disabilities.  In order to increase their chance of scheduling a ride, handilift users must call one week in advance.  When calling, users must be prepared to be on hold for up to 45

minutes.  After making an appointment for pick-up, there is no guarantee that the ride will

come any time near when it is scheduled.  Because of driver or dispatcher negligence, a

substantial portion of rides are late, often very late.  Some rides arrive unreasonably early and

leave before the scheduled arrival time.  Some rides do not appear at all.  When dispatch is

called, users are sometimes given inaccurate information about the status of their ride and its

proximity to their pick-up location.  The air-conditioning on many of these buses is broken.

This exacerbates serious medical conditions in many of its users.  During these trips, riders

are denied access to food and water, medicine and bathroom facilities.  JATRAN's

inadequate performance poses a threat to the health and safety of many of its users while

effectively denying access to public transportation to users with conditions that cannot

tolerate the risk of prolonged exposure to heat.

9.      As stated earlier, the Defendants' paratransit service handilift, is heavily and over-relied

upon because JATRAN has a pattern and practice of failing to fix inoperable lifts on its fixed

route buses.  By failing to train its staff to maintain the lifts on the buses, the plaintiffs and

other individuals with disabilities are routinely left on the side of the road at bus stops while

persons without disabilities board the buses.  JATRAN's fixed route buses operate 24 buses,

6 days a week, between the hours of 4 AM and 7 PM.  The fact that the fixed route buses

operate for an additional hour each day gives persons without disabilities an additional six

hours per week of public transportation access than plaintiffs and similarly situated

individuals in the class who only use handilift and constitutes discrimination under the ADA.

10.     On information and belief, the fleet of fixed route buses is approximately 15 years old.

The buses regularly break down, the air-conditioning does not work, and the lifts do not

work on approximately one-half of the buses.  With this limited schedule, persons in

wheelchairs have been left at the bus stops on a regular basis after being told by the driver

that the lift does not work.  On the smaller "El Dorado" buses, this occurs almost every time

a bus approaches and a mobility impaired rider is waiting. The larger Gillig buses have a lift that is less complex and can be deployed manually.

11.     The Plaintiffs who do not exclusively use handilift, such as Plaintiff Crawford, Banks, Bunche, and Myers, have all experienced this problem within the last one year. The impact of this continuing problem with inoperable lifts is that mobility impaired riders are regularly left at the bus stop and told by the bus driver that they will send paratransit or to wait for another bus with an operable lift causing the rider embarrassment, lost time, prolonged exposure to the elements, inconvenience, and humiliation. The plaintiffs who use the fixed route buses have all experienced watching a bus leave without them only to wait for up to several hours for handilift to arrive.

12.     On information and belief, riders with visual or hearing impairments do not have the same access to information other riders have. The only schedule or route information that is provided to riders is provided at the main bus terminal in downtown Jackson or on its website and it is not provided in any alternative formats for those who are visually-impaired or hearing-impaired. The schedule and route information are impossible to access if a rider cannot make it on a fixed route bus down to the terminal. When riders call, they are directed to the terminal. The internet website does not provide accessible route or schedule information for those who are visually-impaired.

13.     The impact of the defendants' ADA violations on the individual plaintiffs and on members of the Plaintiff class who rely on fixed route buses and who need reliable and accessible public transportation to travel to the grocery store, to the drug store, to participate in civic life, and for other fundamental right and crucial life activities, is profound. The riders are put through a frustrating gauntlet of attempting to ride handilift, which is not reliable or always safe, and waiting for a bus on the off-chance that its lift will be operable. If it is operable when they board the bus, there is the chance that the lift will become

inoperable while they are riding and the rider – as Plaintiffs Crawford and Banks have experienced – will be stranded on the bus until it can be repaired or the lift can be manually lowered.  Again, the persistent second class treatment takes both a physical and psychological toll on the riders.

14.     In 1990, Congress enacted the ADA to address pervasive discrimination against persons with disabilities, including discrimination in the crucial area of public transportation. Congress states that the purpose of the ADA is "(1) provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; (3) to ensure that the Federal Government plays a central role in enforcing the standard established in this chapter on behalf of individuals with disabilities; and (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."  42 U.S.C. §12101(b)(1)-(4).

15.     Title II of the ADA prohibits discrimination by public entities on the basis of disability, and specifically provides that no qualified individual with a disability shall be excluded from participation in or denied the benefits of the services, programs, or activities of such public entity. 42 U.S.C. § 12131, et. seq.  The federal enacting regulations explicitly protect individuals with disabilities from discrimination by a public entity "in connection with the provision of transportation service." 49 C.F.R. § 37.5 (a).

16.     The Rehabilitation Act and its implementing regulations prohibit recipients of federal funding from discriminating against people with disabilities.  It provides in part that "no otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance...." 29

U.S.C. § 794(a).

17.     Appreciating the fact that a lack of reliable transportation is a significant barrier

encountered by persons with disabilities, the ADA expressly requires state and public entities

that provide public transportation provide fixed route transportation that allows persons

with disabilities full and equal enjoyment (42 U.S.C. § 12182) and complementary

"paratransit services" to individuals with disabilities who, by virtue of their disabilities,

cannot otherwise use the public transportation system.    42 U.S.C. § 12101(a).

18.     The transportation JATRAN provides for people with disabilities is materially inferior to

the public transportation available to people without disabilities.  By, among other things,

failing to provide fixed route buses with operable lifts on the majority of its routes and failing

to properly train dispatchers, drivers, and repair persons and thus allowing broken lifts to

remain broken, and keeping bus stops inaccessible to people with disabilities, the defendants

have excluded the individual plaintiffs and the Plaintiff class from participating as full

citizens in Jackson and denied them the benefit of the public transportation system by reason

of their disabilities.

19.     The defendants' failure to provide a paratransit system that complies with federal law –

specifically, routinely failing to schedule eligible trips, providing fewer hours of operation,

failing to maintain partransit buses, and providing exceedingly long trips -- also discriminates

against the Plaintiff class by reason of their disabilities.  The non-compliance with federal law

of the Defendants' fixed route and paratransit system has the effect of unlawfully excluding

the plaintiffs and those similarly situated from equal participation in public transportation

services, and unlawfully denying them the benefit of equal access to public transportation

services.  The plaintiff class is therefore entitled to declaratory, injunctive, and equitable

relief.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law.

21.    This Court has jurisdiction over the Plaintiffs' request for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

22.    Venue of this action properly lies in the Southern District of Mississippi, Jackson Division pursuant to 28 U.S.C. 1391(b)(2) because all of the events and omissions giving rise to this claim arise in this district. The Coalition for Citizens with Disabilities has its principle place of business in Jackson, Mississippi and is a coalition of individuals with disabilities in the greater Jackson, Mississippi area. The Mississippi Council for the Blind Jackson Chapter, ("MCB") is headquartered in Jackson, Mississippi. The individual plaintiffs all reside in Jackson, Mississippi. The City of Jackson and JATRAN have their principle place of business in the city of Jackson, Mississippi.

## PARTIES

23.    Plaintiff Mississippi Coalition for Citizens with Disabilities is a non-profit membership organization that works on behalf of people with disabilities throughout the state of Mississippi to, among other things, ensure that laws important to people with disabilities are enforced.

24.    Plaintiff Mississippi Council of the Blind, Jackson Chapter, is the Jackson Chapter of the Mississippi affiliate of the American Council of the Blind. It is a membership organization with over one hundred (100) members devoted to serving as a support organization and an information source for blind and visually impaired individuals and their families in Jackson, Mississippi.

25.    Plaintiff Scott M. Crawford resides in Jackson, Mississippi and uses JATRAN's handilift and fixed route system weekly as his primary method of transportation. Mr. Crawford

suffers from multiple sclerosis and is mobility impaired, requiring the use of a wheelchair. As a result, he is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2). At all times relevant to this Complaint, he has been eligible for paratransit services and he has been a fixed route bus rider.

26.    Plaintiff Dewone Banks resides in Jackson, Mississippi and uses JATRAN's handilift and fixed route system weekly as his primary method of transportation. Mr. Banks suffers from osteogenesis imperfecta and is mobility impaired, requiring the use of a wheelchair. As a result, he is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2). At all times relevant to this Complaint, he has been eligible for paratransit services and he has been a fixed route bus rider.

27.    Plaintiff Jason Bunche resides in Jackson, Mississippi and uses JATRAN's handlift system weekly as his primary method of transportation. Mr. Bunche suffers from cerebral palsy and is mobility impaired, requiring the use of a wheelchair. As a result, he is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2). At all times relevant to this Complaint, he has been eligible for paratransit services.

28.    Plaintiff Jerri Walton resides in Jackson, Mississippi and uses JATRAN's handilift system weekly as her primary method of transportation. Ms. Walton suffers from cerebral palsy and is mobility impaired, requiring the use of a walker. As a result, she is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2). At all times relevant to this Complaint, she has been eligible for paratransit services.

29.    Plaintiff Lee Cole resides in Jackson, Mississippi and uses JATRAN's handilift system weekly as her primary method of transportation. Ms. Cole is visually impaired, as a result, she is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2). At all times relevant to this Complaint, she has been eligible for paratransit services.

30.    Plaintiff Jan Hawthorne resides in Jackson, Mississippi and uses JATRAN's handilift

system daily as her primary method of transportation to her job at the Mississippi School for

the Blind.  Ms. Hawthorne is visually impaired and as a result she is a "qualified individual

with a disability" pursuant to 42 U.S.C. § 12131(2).  At all times relevant to this Complaint,

she has been eligible for paratransit services.

31.    Plaintiff Irene Myers resides in Jackson, Mississippi and uses JATRAN's handilift and

fixed route bus system weekly as her primary method of transportation.  Ms. Myers is

mobility impaired due to multiple medical problems and as a result she is a "qualified

individual with a disability" pursuant to 42 U.S.C. § 12131(2).  At all times relevant to this

Complaint, she has been eligible for paratransit services.

32.    Plaintiff Melvina Tobias resides in Jackson, Mississippi and uses JATRAN's handilift and

fixed route bus system weekly as her primary method of transportation.  Ms. Tobias is

"mobility impaired" and as a result she is a "qualified individual with a disability" pursuant to

42 U.S.C. § 12131(2).  At all times relevant to this Complaint, she has been eligible for

paratransit services.

33.    Plaintiff Eddie Turner resides in Jackson, Mississippi and uses JATRAN's handilift

system as a supplementary method of transportation.  Mr. Turner is visually impaired and as

a result, he is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  At

all times relevant to this Complaint, he has been eligible for paratransit services.

34.    Plaintiff Bonnie Thompson resides in Jackson, Mississippi and uses JATRAN's handilift

system as a supplementary method of transportation.  Ms. Thompson is visually impaired

and as a result, she is a "qualified individual with a disability" pursuant to 42 U.S.C. §

12131(2).  At all times relevant to this Complaint, she has been eligible for paratransit

services.

35.     Plaintiff Gwendolyn Byrd resides in Jackson, Mississippi and uses handilift as her primary method of transportation.  Ms. Byrd is visually impaired and as a result, she is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).  At all times relevant to this Complaint, she has been eligible for paratransit services.

36.     Defendant JATRAN is an instrumentality of the City of Jackson created to provide public bus and trolley transportation.

37.     Defendant City of Jackson ("the City" or "City") is the public entity responsible for JATRAN and a "public entity" within the meaning of 42 U.S.C. § 12131.

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs Coalition for Citizens with Disabilities, Mississippi Council of the Blind, Jackson Chapter, Scott M. Crawford, Dewone Banks, Jason Bunche, Napoleon Campbell, Jerri Walton, Lee Cole, Jan Hawthorne, Irene Myers, Bonnie Thompson, Melvina Tobias, and Eddie Turner bring this action on behalf of themselves and all other persons similarly situated, pursuant to Fed. R. of Civ. Pro. 23(a), (b)(1) and (b)(2).  The class members consist of organizations representing individuals with disabilities in Jackson, Mississippi and residents of Jackson, Mississippi who are individuals with disabilities and rely on JATRAN as their primary method of transportation and who are, have been, or will be: 1) denied fixed route bus access because of inoperable lifts or inaccessible bus stops; and 2) denied paratransit services comparable to the level of services provided to individuals without disabilities who use JATRAN's fixed-route bus system.

39.     Each individual member of the proposed class is a "qualified individual with a disability" pursuant to 42 U.S.C. § 12131(2).

40.     The exact size of the class is unknown to the Plaintiffs, but on information and belief the class number is approximately equal to the 13,000 people in Jackson, Mississippi who are

people with disabilities who are being denied full and equal enjoyment of JATRAN's fixed route bus and paratransit service system and who would use the public transportation system if it were ADA-compliant. The class is so numerous that joinder of all members is impracticable.

41.     The questions of law and fact common to the class include:

42.     Whether the Defendants are violating Title II of the ADA and its implementing regulations by: consistently failing to provide fixed-route buses with operable lifts; failing to repair inoperable lifts on fixed route buses when they are broken; failing to train its employees to service bus lifts when they break; failure to provide buses with air-conditioning; providing materially inferior paratransit service to persons with disabilities compared to service provided to persons without disabilities; denying eligible paratransit trips; requiring eligible paratransit trips to be scheduled one week in advance; requiring riders with disabilities to schedule trips more than one hours prior to their desired departure time; failing to make information accessible to people with hearing and visual impairments; and failing to provide bus stops that are wheelchair accessible.

43.     Whether the Defendants are violating the Rehabilitation Act by consistently failing to provide fixed-route buses with operable lifts; failing to repair inoperable lifts on fixed route buses when they are broken; failing to train its employees to service bus lifts when they break; failure to provide buses with air-conditioning; providing materially inferior paratransit service to persons with disabilities compared to service provided to persons without disabilities; denying eligible paratransit trips; requiring eligible paratransit trips to be scheduled one week in advance; requiring riders with disabilities to schedule trips more than one hours prior to their desired departure time; failing to make information accessible to people with hearing and visual impairments; and failing to provide bus stops that are wheelchair accessible.

44.     The claims of the named Plaintiffs are typical of those of the class.  The named Plaintiffs'

claims arise from the same source of conduct.  Namely, the Plaintiffs' claims arise from the

Defendants' consistently failing to provide fixed-route buses with operable lifts; failing to

repair inoperable lifts on fixed route buses when they are broken; failing to train its

employees to service bus lifts when they break; failure to provide buses with air-conditioning;

providing materially inferior paratransit service to persons with disabilities compared to

service provided to persons without disabilities; denying eligible paratransit trips; requiring

eligible paratransit trips to be scheduled one week in advance; requiring riders with

disabilities to schedule trips more than one hours prior to their desired departure time; failing

to make information accessible to people with hearing and visual impairments; and failing to

provide bus stops that are wheelchair accessible.

45.     The named Plaintiffs will fairly and adequately represent the interests of the class.  They

have no interests that are antagonistic to the class and seek relief which will benefit all

members of the class.

46.     The attorneys representing the Plaintiffs include experienced civil rights attorneys with

specific experience representing persons with disabilities.

47.     The Defendants have acted and continue to act on grounds generally applicable to the

class, making injunctive and declaratory relief appropriate to the class as a whole.

## FACTUAL ALLEGATIONS

### FAILURE TO PROVIDE FIXED ROUTE BUSES

### WITH OPERABLE LIFTS

48.     On information and belief, approximately one-half of the City's fixed route buses do not

have operable lifts.  A representative of JATRAN's subcontractor, Jim Bender, reported this

information to the city's ADA Council on June 18, 2008.

49.     With the exception of riders who exclusively use handilift, each plaintiff who uses

JATRAN's fixed route system has been left on the side of the road because of an inoperable

lift.  One of the most egregious incidents occurred in December 2006 when Plaintiff

Crawford took a JATRAN fixed route bus to North Park mall.  After shopping, he went to

the bus stop to catch the bus back to his home.  Three buses left him stranded at the bus

stop stating that their lift(s) did not function and that another bus with a functioning lift

would be arriving.  After the buses had stopped running for the evening, a Ridgeland police

officer gave him a ride home.  Otherwise, he would have been stranded for the evening.

50.     As recently as April 2008, Plaintiff Crawford was left on the side of the road when the

fixed route bus he was waiting for arrived with an inoperable lift.  The occasion was

memorable because a crew from the Mississippi Department of Transportation waited with

him until a handilift bus was dispatched to pick him up.  On July 29, 2008, Plaintiff Crawford

filed one of several Federal Transit Administration ("FTA") complaints with the City's newly

appointed ADA Coordinator to complain about the fact that the Defendants' still have many

buses that do not have operable lifts.  See Exhibit 1 (Complaints of Dr. Scott Crawford

Detailing ADA Violations of Defendants).  In the July 29, 2008 complaint to the

Defendants' ADA Coordinator, Plaintiff Crawford described riding his power wheelchair

from the Capitol to 1304 Vine Street in 100 degree Fahrenheit heat because he knows that

the lift on the #4 bus does not work and refers the ADA Coordinator back to a previous

complaint.  In an attempt to ride the #1 bus home, he was informed by the driver of the first

bus that the lift was inoperable.  He was forced to wait in the heat for another bus to arrive

with an operable lift.  His inability to take public transportation because of the defendants'

failure to comply with the law exacerbates his already fragile medical condition (Multiple

Sclerosis).

51.    Plaintiff Irene Myers began a public transportation trip from her apartment home in

Willow Point Apartments on Glen Cross Road traveling to North Park Shopping Mall on

County Line Road during the last Christmas shopping season. She approached the fixed

route bus stop near her house, but the bus arrived with an inoperable lift. The bus driver

agreed to call handilift for her. The handilift arrived and took her to the shopping mall on

County Line Road. After she finished a short shopping trip, Plaintiff Myers called the

dispatcher to get a handilift ride back to her home from the mall. The dispatcher told her to

take the fixed route bus. Plaintiff Myers explained that she did not know where the bus stop

was because she had not arrived on the fixed route bus and that the lift on the fixed route

bus was inoperable. The dispatcher told her that the lift was repaired and that she would not

send a handilift bus out there because she had not scheduled the trip.

52.    In her wheelchair, Plaintiff Myers went searching through the busy mall parking lot for

the bus stop. A kind motorist assisted her by stopping traffic while she crossed a busy

intersection to get to the bus stop only to wait for approximately 45 minutes for a bus to

arrive with an inoperable lift. The bus driver informed her that his lift had not been operable

for some time and agreed to call handilift for her. After handilift was called, she waited for

an hour before calling dispatch when she was told that the handilift driver was dispatched to

the bank at the mall to pick her up and could not find her there even though she had been

instructed to go to the bus stop. Finally, well after dark and approaching the hour when

handilift and buses discontinue running, she was picked up by the handilift, exhausted and

fearful of ever returning to the mall.

53.    Plaintiff Dewone Banks relies on JATRAN as his primary method of transportation and

has been left at bus stops on numerous occasions because the lifts on the fixed route buses

do not work. Approximately one year ago, Plaintiff Banks was stranded on a fixed route bus

when he was able to be put onto the bus, but it would not deploy to allow him to get off the

bus.  JATRAN had to carry him off the bus, causing him great embarrassment and humiliation.

54.     On another occasion, Plaintiff Banks went to North Jackson near North Park Mall and the bus on which he was riding caught on fire.  Not only was he stranded, but given the inconsistency of the lifts, Plaintiff Banks was put in grave danger by this situation because unlike his able-bodied peers, had the bus become engulfed, he likely would have perished.  As a result, Plaintiff Banks suffered additional anxiety and distress from the fire and the resulting inconvenience of being stranded while waiting for another bus to arrive.  In December 2007 and March 2008, Plaintiff Banks documented these complaints.

55.     The defendants admit that one-half of the City's bus lifts are inoperable, it is clear that the Defendants are not maintaining the inoperable lifts on the fixed route buses, nor do they intend to make them accessible for people with disabilities.  There is no reasonable accommodation for the plaintiffs, who are forced to accept the fact that he lifts on the buses do not work more often than not.  This problem has been on-going for several years.  Furthermore, as evidenced by complaints made to the Defendants, even after getting recent notice of inoperable lifts, the Defendants do nothing to repair them.

56.     As a result of the Defendants' failure to comply with applicable laws, the plaintiff class if forced to over-rely upon handilift.  Handilift is not well-maintained, the buses are subject to breakdown because of the excessive use, and it is not an adequate substitute for access to the fixed route system.

## FAILURE TO ADEQUATELY TRAIN STAFF

57.     Plaintiffs Crawford, Cole, Banks, Hawthorne and Myers have all experienced JATRAN dispatch staff who have been disrespectful or dishonest with them during the last one year.  Worst of all, plaintiffs Hawthorne, Crawford, Cole, and Myers report that the dispatch staff is incompetent.  The dispatch staff does not accurately record or relay information from the

rider to the driver, including an address change from one rider that was not changed in the system for over a year.  As a result, Plaintiff Jan Hawthorne has experienced the handilift going to the wrong address to pick her up (or to pick others up), resulting in additional lost time and late arrivals for work and appointments.  Plaintiff Lee Cole experienced staff incompetence when she called to confirm a scheduled pick up of 11:45 AM and the dispatcher never called her back to inform her that her time had been changed to 12:30 PM.

58.     All of the plaintiffs have experienced the results of Defendants' inability to train staff to maintain and repair the buses.  As a result of the failure to maintain and repair the buses, all of the individual plaintiffs have been late or stranded or both in their attempts to travel throughout the city on their personal and business trips.  Also, when drivers cannot or will not manually deploy a lift (either out of lack of know-how or lack of sensitivity training), this leaves mobility impaired riders – such as Plaintiffs Crawford, Banks, Myers, and Tobias stranded because of JATRAN's failure to train its employees.  When lifts stay broken for weeks or months and engines fail routinely, the riders who rely on public transportation are put at a huge disadvantage to persons without disabilities who can ride in cars or taxis to conduct their daily routines.  Despite the intent of the ADA, many of JATRAN's riders are literally left behind.

## FAILURE TO OPERATE BUSES WITH AIR-CONDITIONING

59.     In addition to operating buses that are literally inaccessible for mobility-impaired riders because of inoperable lifts, because of the failure to maintain the 15 year-old fleet, many of the plaintiffs – specifically Crawford, Banks, Hawthorne, Myers and Cole – are constructively denied access to the buses when the air conditioning does not work as is often the case.  Because the lack of air-conditioning in the sub-tropical climate of Jackson, Mississippi exacerbates the health conditions of many persons with disabilities, those riders are forced to either suffer serious health consequences from riding the bus in extremely hot conditions or

are denied access to the bus system all together even if the bus arrives with an operable lift. The heat harms Plaintiffs with multiple sclerosis like Plaintiff Crawford, and high blood pressure, like Plaintiffs Banks, Cole, Crawford, and Myers, or migraines, like Plaintiff Hawthorne. As a result, they are taking extreme risk or effectively denied the benefits of public transportation in the summer if the air-conditioning is not working.

## DENIAL OF ELIGIBLE PARATRANSIT TRIPS

60.     All of the plaintiffs have had the experience of being denied handilift service because it is "booked." As a result, they call one week in advance to reserve a ride. This practice hampers their ability to fully participate as  full members of Jackson society because many things, such as illness and social events, cannot be scheduled a week in advance.

61.     In May 2007, Plaintiff Crawford called defendants to reserve handilift for a ride to the hospital on the following day for treatment of multiple sclerosis exacerbation. He was denied serviced because the schedule was full. He protested that the need was urgent, but was still not given service. The dispatcher suggested he call an ambulance, but Crawford knew that an ambulance was not necessary and would be prohibitively expensive.

62.     Plaintiff Banks has been denied handilift rides approximately 8 times in the past one year. One time, the ride request was for a doctor's appointment, but he was told that the schedule was full and he had to urge a friend to take him.

63.     Plaintiff Myers had a similar experience in spring 2008. After speaking to her doctor, she was told to go to the hospital because of an infection to a non-healing wound on her leg, but was denied handilift service. She was told that next day service was not available. Prior to speaking with her doctor, she was unaware of the urgency of going to the hospital and could not possible have scheduled the trip earlier. Yet, the trip was denied.

64.     Plaintiff Jerri Walton relies on JATRAN to get to her volunteer position at Living Independence for Everyone ("LIFE") each week. As recently as September 2008, Plaintiff

Walton called to reserve paratransit transportation to LIFE and was told that handilift was booked.  On September 18, 2008, Plaintiff Walton took at a handi-lift bus to LIFE and was able to board the bus by its lift.  However, the lift was difficult to get back up.  When she arrived at her job, she was forced to use the van's stairs with the help of the driver and others to disembark.  On no less than one other occasion in the last year, the handilift bus that arrived to take her from her home to LIFE has had an inoperable lift.  When that occurred, she was picked up and placed in the back of a cargo-type van that she could not easily get into.

65.     Plaintiff Jason Bunche relies on JATRAN as his primary method of transportation.  He has experienced numerous problems with buses breaking down, overheating, and lifts not working causing him not to be able to travel throughout the city.  For three months during the spring of 2008 he worked at the Mississippi Arts Center Monday through Saturday.  On at least one occasion, he was late because the lift on his bus was inoperable.

66.     As evidenced by the denial of eligible paratransit trips, the Defendants have a practice of requiring one weeks' notice for paratransit service for eligible rides.  Defendants Crawford, Banks, Cole, Myers and Walton have all been denied trips when giving 24 hours' notice (or more) in the last year.

67.     The Defendants have a practice of refusing to allow handilift reservations to be made on Saturdays, even though the Defendants operate on Saturdays.  As a result, a rider seeking to schedule a trip for a Monday must schedule the trip on Friday to give 24 hours' notice.  With the one week practice in place, Monday trips essentially need to be made ten days in advance.

## LATE AND EXTENDED PARATRANSIT TRIPS

68.     Plaintiffs Hawthorne, Byrd, Cole and Walton have experienced the routine failure of the handilift to arrive on time and the failure to arrive at their destinations on time.  Plaintiffs Byrd and Hawthorne rely on handilift to take them to work at the Mississippi School for the

Blind.  During the course of the year, Plaintiff Hawthorne was up to an hour late on more than five occasions.  As a visually impaired rider, she was dropped off in the wrong location on one occasion causing her to be late for work.  On another occasion, the bus broke and the dispatcher lied and told her it was on its way.  Another rider called her and told her to find another way to work, but she still arrived late.  On other occasions, she arrived late at work after the bus waited at a certain pick up on the route for ten to fifteen minutes.  All of these instances cause her to arrive to her job late even though she only lives a few miles from the facility where she works and she allots over an hour to get there.

69.     Plaintiff Cole, as recently as July 2008, had an extended handilift trip because she and the other passengers were moved from a bus to a utility van.  The seats were not equipped with seat belts, the seats were not secured fully to the floor of the van, and after other passengers disembarked, when the bus turned corners Plaintiff Cole almost fell off of the van's seat.

70.     Plaintiff Bunche, on two occasions, arrived late for work at the Mississippi Center for the Arts because the handilift van that picked him up broke down.

## FAILURE OF DISPATCHERS TO SEND PARATRANSIT DRIVERS
## TO CORRECT ADDRESS

71.     Plaintiff Hawthorne was late to work on several occasions because for a year, despite her notice to dispatch, the drivers of the handilift vehicles had her old address in the system.  As a result, when she called for a ride, they would be dispatched to the wrong address.  The dispatchers, when corrected, were rude and often failed to accommodate her request that they be immediately sent to her new address.

72.     Plaintiff Walton recently moved and was informed by drivers that her new address made it difficult to find her home.  She lives on Woodway Dr. in Jackson and defendants' drivers have informed her that there are two Woodway drives.  However, the plaintiffs are unable to locate more than one Woodway Dr. in Jackson.

## FAILURE TO PROVIDE ACCESSIBLE BUS STOPS

73.  On September 12, 2007, a complaint was filed with the Department of Justice alleging that Jackson is non-compliant with Title II for having no ADA Coordinator, no public notice or grievance procedure, and poor access to public rights-of-way, specifically sidewalks, bus stops, and some City buildings. See Exhibit 1.  On information and belief, to date, many of the issues raised in the September 12, 2007 complaint have not been addressed.

74.  The Reverend Sam Gleese was subsequently hired as Jackson's ADA Coordinator, and a public notice and grievance procedure is in the process of being distributed.  However, addressing access to public rights-of-way was thought to require a survey of Jackson's streets. Plaintiff Crawford worked with a disability rights organization, LIFE, to document the inaccessibility of many of JATRAN's bus stops from January through March of 2008.  See Exhibit 2 (City of Jackson Sidewalk and Bus Stop Surveys).  A complete report was submitted to the City of Jackson in April, 2008, detailing the deficiencies with recommendations for how to address them.

75.  Even with these strides and numerous attempts on the part of the plaintiffs to ask the Defendants to comply with the ADA, mobility impaired riders cannot access JATRAN's fixed route system at many of its bus stops because there are no curb ramps, no crosswalks, no sidewalks, no crossing signals and no loading platforms.  These conditions make the bus stops dangerous for persons with disabilities attempting to access the fixed route system at these locations, if not completely inaccessible.  The surveys finding were:

a.  At the fixed route bus stop at Canton Mart Road and Interstate-55, the southbound stop for the #1 bus is completely inaccessible for the plaintiffs and similarly situated persons with disabilities because there are no curb ramps; there is no sidewalk; there is no crosswalk; there is no crossing signal; and there is no shelter.  On information and belief,

the #1 route is heavily used by persons with disabilities including plaintiffs Crawford,

Banks and Myers.

b.   At the fixed route bus stop at the Central Mississippi Medical Center, there are no

curb cuts, there is no sidewalk, and there is no shelter.  The Plaintiffs who use this

hospital and mobility-impaired persons with disabilities attempting to access medical care

through the bus stop at this location are forced to wait in the street.

c.   The #9 bus stop at Chadwick Drive in front of the Sumner Park Apartments has no

sidewalk, no curb cuts and no shelter.  On this heavily traveled street between the only

Jackson Wal-Mart and the Central Mississippi Medical Center, there is clear use of heavy

pedestrian traffic, but no way for the Plaintiffs or mobility-impaired persons with

disabilities to access the bus stop without riding in the street.  Riding in a wheelchair in

the street at this location would be impossible without risking one's life.

d.   The bus stop at East Beasley Road near the I-55 Frontage Road has no side walk, no

curb cuts, and a shelter that does not comply with ADA standards.

e.   On the south side of County Line Road, the bus stops are inaccessible to the

Plaintiffs and persons with disabilities because the sidewalks are non-existent or broken,

there are inadequate curb ramps, cross signals are inaccessible, and there are no shelters.

On such a busy Jackson thoroughfare, the bus stops along this major shopping road are

completely inaccessible.  Plaintiffs Crawford, Banks and Myers have all experienced the

inaccessibility of the stops along this route.

f.   The bus stops serving the #2 and the #9 bus routes near Jackson Stew Pot

Community Services on West Capitol Street are equally inaccessible to persons with

disabilities because the curb ramps do not meet ADA standards, there are no crosswalks,

and there are no shelters to protect power chair users from the elements.  Plaintiff

Crawford occasionally delivers food to the Stewpot using those bus stops and has witnessed others in wheelchairs using this bus stop.

g.   The bus stop at Jackson-Hinds Comprehensive Health Center is dangerous for persons with disabilities because mobility-impaired riders are forced to wait in the street for the bus at the stop.  In fact, when Plaintiff Crawford was at the site several months ago, he was approached by a security guard and warned that he may be struck by a careless driver.

h.   The bus stop for the #4 bus at an elderly housing complex on 550 Houston Road in Jackson, Madonna Manor, does not meet the ADA's minimum requirements because there is no shelter and there is a non-compliant curb ramp.

i.   The bus stop on North State Street near the Piggly Wiggly violates ADA's requirements because it does not have a shelter, there are no curb cuts, and there is no sidewalk.  This makes it completely inaccessible for riders such as Plaintiff Scott Crawford who lives only a block from there and is forced to wait for the bus in the street or ride over uneven concrete to access public transportation.

j.   The bus stop for route #12 at Old Canton Road at Parham Park violates the ADA because it lacks curb ramps, the sidewalk ends abruptly causing mobility-impaired riders to go through grass and potentially damage their chairs, and there are no shelters.  In addition, there is no crosswalk or signal, causing a rider to have to ride in the street to access the park.

k.   The bus stop for route #12 at Ridgewood Road near the Brookshire's grocery store is inaccessible for many of the Plaintiffs and other mobility impaired riders because there are no curb ramps, there is no shelter, there is no cross walk, there are no signals, and there is no realistic way for a rider to get from the East side of the street to the shopping area on the West side of the street without dodging traffic.

l.   The bus stop at the Target Shopping Center at County Line Road and I-55 in Jackson was built after the implementation of the ADA and is still out of compliance.  There are no curb ramps providing access to the bus stop, and the sidewalks and shelter slab are too small for wheelchairs to navigate.  Also, the shelter bench has no cut-out for wheelchair users.  Plaintiff Banks has used this stop on occasion in the last year.

m.   The Village Apartment bus stop for Route #7 on Raymond Road is in need of sidewalk improvements, crosswalks, and bus shelters.  Without these modifications, it is dangerous for all riders, especially the plaintiffs and others with disabilities.

n.   There is a non-compliant bus stop immediately in front of G.V. (Sonny) Montgomery Veteran's Medical Center in which there is no paved slab, no curb ramps, no bench, and no shelter.  Elderly and medically frail veterans are forced to stand in the weather.  It is inaccessible or extremely difficult to access for mobility impaired riders.

o.   There is no longer a bus stop in the Willow Point Apartments where Plaintiffs Myers and Tobias reside.  As a result, they are either forced to ride in traffic to a busy street and cross traffic to catch a fixed-route bus or they must rely on handilift.

p.   JATRAN Route #2 serves West Capital Street and Clinton Boulevard heading toward the neighborhoods of Northwest Jackson.  On Flag Chapel Road, the Westwick Apartments house people with lower incomes who frequently ride the bus.  There are no curb ramps, no shelters, no sidewalks, no crosswalk and no crossing signals.

## CLAIMS

## FIRST CLAIM FOR RELIEF – VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12143

76.   Plaintiffs reallege and incorporate paragraphs 1-75 as if specifically set forth herein and further allege:

77.    Plaintiffs are qualified persons with disabilities as defined by Title II of the ADA and the

Rehabilitation Act. 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B).

78.    The City of Jackson and JATRAN are public entities covered by Title II of the ADA and

its implementing regulations. 42 U.S.C. § 12131(1); 49 C.F.R. 37.1-37.175.

79.    The ADA requires that public entities which operate fixed route transportation systems

provide comparable paratransit and other special transportation services to individuals with

disabilities, including individuals who use wheelchairs. 42 U.S.C. § 12143(a).

80.    The ADA specifically sets forth categories of individuals who qualify as eligible recipients

of paratransit service and who must be provided with such service. 42 U.S.C. § 12143(C)

(1)(A)(i)-(iii).

81.    The ADA mandates that paratransit and other special transportation services be provided

to:

Any individual with a disability who needs the assistance of a wheelchair lift or
other boarding assistance device (and is able with such assistance) to board,
ride, and disembark from any vehicle which is readily accessible to and usable
by individuals with disabilities if the individual wants to travel on a route on
the system during the hours of operation of the system at a time (or within a
reasonable period of such time) when such a vehicle is not being used to
provide designated public transportation on the route. 42 U.S.C.
§12143(C)(1)(A)(ii).

82.    The implementing regulations for the ADA and the Rehabilitation Act's paratransit

requirements also mandate that paratransit service or other special transportation service

must be provided to:

Any individual with a disability who needs the assistance of a wheelchair lift or other
boarding assistance device and is able, with such assistance, to board, ride, and
disembark from any vehicle which is readily accessible to and usable by individuals
with disabilities if the individual wants to travel on a route on the system during the
hours of operation of the system at a time, or within a reasonable period of such time,
when such a vehicle is not being used to provide designated public transportation on
the route. 49 C.F.R. § 37.123(e)(2).

83.    The ADA's implementing regulations define equivalent service for persons with

disabilities as:

When viewed in its entirety, shall be deemed to provide equivalent service if the service available to individuals with disabilities, including individuals who use wheelchairs, is provided in the most integrated setting appropriate to the needs of the individual and is equivalent to the service provided other individuals with respect to the following service characteristics:

a.  Schedules/headways (Fixed Route)
b.  Response Time (On Demand)
c.  Fares
d.  Geographic area of service
e.  Hour and days of service
f.  Availability of information
g.  Reservation capability
h.  Any constraints on capacity or service availability
i.  Restriction priorities based on trip purpose.  49 C.F.R. §37.105

84.     The Defendants are not providing equivalent service to the named and class Plaintiffs in violation of Title II of the ADA, 42 U.S.C. § 12131, et. seq.

85.     The Defendants have discriminated against the named and class Plaintiffs by reason of their disability in violation of Title II of the ADA, 42 U.S.C. § 12131, et. seq.

86.     The Defendants have discriminated against the named and class Plaintiffs in violation of Title II of the ADA, 42 U.S.C. § 12143 (a) by failing to provide transportation services to individuals with disabilities, including individuals who are mobility impaired, that are sufficient to provide these individuals a level of service that is comparable to the level of designated public transportation services provided to individuals without disabilities.

87.     The Defendants have unlawfully failed to meet required service criteria for their complementary paratransit system. See 49 C.F.R. § 37.131.  Specifically, the Defendants have permitted an operational pattern and practice that significantly limits service to ADA paratransit-eligible persons. 49 C.F.R. § 37.131(f)(3).

88.     The Defendants are violating the ADA by having a pattern and practice of operating their fixed route buses without operable lifts, by failing regularly check and maintain the lifts, and by failing to repair inoperable lifts within five (5) days.  49 C.F.R. § 37.163.

89.     The Defendants are discriminating against the named and class Plaintiffs by requiring passengers to reschedule eligible paratransit trips or by having a pattern and practice of denying eligible paratransit trips.  49 C.F.R. § 37.207.

90.     The Defendants are discriminating against the named and class Plaintiffs by failing to adequately train personnel to properly assist and treat individuals with disabilities who use their services in a respectful and courteous way.  49 C.F.R. § 37.173.

## SECOND CLAIM FOR RELIEF – VIOLATION OF § 504 OF THE
## REHABILITATION ACT, 29 U.S.C. § 794

91.     Plaintiffs reallege and incorporate paragraphs 1-90 as if specifically set forth herein and further allege:

92.     The named and class plaintiffs are "qualified individuals with a disability" under Section 504 of the Rehabilitation Act of 1973.  29 U.S.C. § 794.

93.     The Defendants receive federal financial assistance and thus are subject to the Rehabilitation Act. 29 U.S.C. §§ 794 (a); 794(b)(1)(A).

94.     The Defendants operate a "program or activity receiving Federal financial assistance" under Section 504 of the Rehabilitation Act.

95.     The Defendants have subjected the named and class Plaintiffs to discrimination solely by reason of their disability.

## THIRD CLAIM FOR RELIEF – VIOLATION OF THE CIVIL RIGHTS ACT,
## 42 U.S.C. § 1983

96.     Plaintiffs reallege and incorporate paragraphs 1-95 as if specifically set forth herein and further allege:

97.     Defendants' violations of the ADA and Section 504 of the Rehabilitation Act, as set forth above establish a cause of action under 42 U.S.C. § 1983.  Specifically, the conduct of the

defendants, acting under color of state law, has violated the federally protected rights of the plaintiffs.

## **REQUEST FOR RELIEF**

Plaintiffs request that this Court:

1.      Certify this case to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2).

2.      Declare that the Defendants' actions and inactions violate the ADA, the Rehabilitation Act and § 1983 of the Civil Rights Act.

3.      Issue appropriate injunctive relief on behalf of the named and class Plaintiffs ordering Defendants to develop and implement a remedial plan, complying with the requirements of the ADA and Rehabilitation Act, and subject to approval by this Court, ending the unlawful practices, acts, and omissions complained of herein, and to submit this plan to the Court and to the attorneys for Plaintiffs' counsel for their review and approval.

4.      Grant Plaintiffs such additional relief as this Court may deem just, proper, and equitable, including an award of reasonable attorneys' fees, litigations expenses, and costs pursuant to 42 U.S.C. § 12205 and 29 U.S.C. § 794(a).

Dated this 23 rd day of September, 2008

By:

_____

Courtney A. Bowie (MS Bar No. 102528)
Law Office of Courtney Bowie
P.O. Box 736
Jackson, MS 39205
601-717-3107 (Phone)
601-709-0250 (Fax)
courtney@cbowielaw.com (E-mail)


Rebecca Floyd (MS Bar No. 5385)
Mississippi Protection and Advocacy
5305 Executive Place, #A
Jackson, MS 39206
601-981-8207 (Phone)
601-981-8313 (Fax)
slupride@bellsouth.net (E-mail)